IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                    No. 14-20319-SHM-dkv

JAMIE THOMAS,

    Defendant.

_____

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

_____

On November 20, 2014, the grand jury returned a one-count indictment charging the defendant, Jamie Thomas ("Thomas"), with possession of a firearm as a convicted felon in violation of 18 U.S.C. § 922(g). (Indictment, ECF No. 2.) Now before the court is Thomas's January 14, 2016 motion to suppress evidence obtained by Memphis Police Department ("MPD") officers following a traffic stop of Thomas on September 10, 2014. (Def.'s Mot. to Suppress, ECF No. 27.) The government filed a response on February 16, 2016, (ECF No. 31), and a supplemental response on April 14, 2016, (ECF No. 39). The motion was referred to the United States Magistrate Judge for a report and recommendation. (ECF No. 28.)

Pursuant to the reference, the court held an evidentiary hearing on April 19, 2016. At the hearing, the government

called three witnesses, Sergeant Deborah Shempert ("Sgt. Shempert"), MPD Sergeant Brian Nemec ("Sgt. Nemec"), and MPD Detective Eric Dobbins ("Detective Dobbins"). The government introduced four exhibits into evidence: (1) a CD recording of a phone call made by Thomas on July 10, 2015, while detained at the West Tennessee Detention Facility, (Ex. 1); (2) a diagram indicating Detective Dobbins's location while conducting surveillance on Thomas on the morning of September 10, 2014, (Ex. 5); (3) a photograph of Sgt. Nemec's Ford truck displaying the location of the blue lights, (Ex. 8); and (4) a photograph of Detective Dobbins's Ford SUV displaying the location of the blue lights, (Ex. 9). Thomas did not call any witnesses and introduced five exhibits into evidence: (1) Section 21-338 of the City of Memphis Code of Ordinances and an ordinance amending section 21-338, Ordinance # 5559, dated September 22, 2014, (Ex. 2); (2) a diagram indicating the locations of the vehicles of Thomas, Sgt. Nemec, and Detective Dobbins during Thomas's traffic stop, (Ex. 3); (3) a diagram indicating the location where Thomas jumped out of his vehicle and the route Thomas ran, (Ex. 4); (4) a photograph of Detective Dobbins taken after Thomas's arrest, (Ex. 6); and (5) a diagram indicating the location of Thomas's vehicle after Detective Dobbins brought it to a stop. (Ex. 7).

At the hearing, Thomas requested additional time to file a supplemental brief addressing the government's supplemental response. The court granted Thomas's request, and, on April 19, 2016, Thomas filed a supplemental brief in support of his motion to suppress. (ECF No. 43.) The government responded on May 2, 2016, (ECF No. 45), and Thomas filed a reply on May 5, 2016, (ECF No. 46).

After careful consideration of the statements of counsel, the testimony of the witnesses, the exhibits introduced at the hearing, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be denied.

## I. PROPOSED FINDINGS OF FACT

The government's first witness, Sgt. Shempert, works at the West Tennessee Detention Facility in Mason, Tennessee. One of her duties is serving as the telephone liaison, which entails maintaining and keeping recordings of inmate phone calls. Sgt. Shempert explained that each inmate at the West Tennessee Detention Facility has a unique personal identification number which they use to make phone calls. All phone calls are recorded and kept in the regular course of business. Sgt. Shempert testified that she provided the government with the CD of a phone call that was made on July 10, 2015 at 1:03 p.m. by

Thomas.  (Ex. 1.)[1]  During this phone call, Thomas discussed the September 10, 2014 traffic stop with an unidentified individual, and, at one point, Thomas stated: "The stop wasn't bogus because I didn't have a seatbelt on."  (Ex. 1.)

The government's second witness, Sgt. Nemec, has worked for the MPD for twenty-three years and is currently assigned to the MPD's Organized Crime Unit.  On September 10, 2014, at 7:00 a.m., Sgt. Nemec, along with Detective Dobbins and two other MPD officers, was conducting surveillance at Thomas's apartment located at 1294 Court Ave, Memphis, Tennessee.  The officers had secured a narcotics search warrant for Thomas's apartment and were waiting for Thomas to leave before executing the warrant. Sgt. Nemec was stationed in a parking lot located west of Thomas's apartment complex, he was wearing plain clothes and driving an unmarked pick-up truck.  From his vantage point, Sgt. Nemec had an unobstructed view of the entire rear of Thomas's apartment complex.[2]  Sgt. Nemec testified that he observed one individual exit Thomas's apartment and do something with an abandoned car sitting in the parking lot of the apartment complex.  Sgt. Nemec then saw Thomas, who was wearing a pink shirt and a pink hat, exit his apartment and get in his car.

[1]Sgt. Shempert testified that she has had contact with Thomas on several occasions and she recognized Thomas's voice as one of the participants in the phone call.

[2]Sgt. Nemec testified that he was also using binoculars to aid him with surveillance.

Sgt. Nemec testified that he was aware of Thomas's appearance because he had seen a picture of Thomas before. Sgt. Nemec was also aware that Thomas drove a 2007 white Dodge Charger.

Sgt. Nemec testified that before Thomas entered his car, the car windows were raised all the way up and he could not see inside the car because the window tint was dark. On cross-examination, Sgt. Nemec stated that windows were too heavily tinted to be in compliance with city ordinance, which he believed allowed for 35% light transmittance. The Memphis ordinance applicable on September 10, 2014, Memphis City Code of Ordinances § 21-338, was later introduced into evidence. It stated that it was unlawful to operate a vehicle with material that reduced the light transmittance below 18%. (Ex. 2.) This ordinance was amended on September 22, 2014 to increase the light transmittance limit to 35%. (*Id.*)

According to Sgt. Nemec, once Thomas entered his car, he rolled his car windows approximately halfway down and Sgt. Nemec could see Thomas's head, neck, and his shoulders. Thomas sat in his car for a while talking to the other individual and then pulled out of his driveway onto Court Avenue. Sgt. Nemec relayed the information to the other detectives conducting surveillance via radio and began driving toward Thomas's direction. Sgt. Nemec testified that at the intersection of

Claybrook Street and Poplar Avenue, Detective Dobbins was directly behind Thomas and Sgt. Nemec was a few cars behind.

Sgt. Nemec testified that Detective Dobbins initiated a traffic stop of Thomas on Poplar, just east of North Pauline Street, by turning on both blue lights and sirens. Sgt. Nemec followed suit. According to Sgt. Nemec's testimony, the officers did not pull Thomas over at this time because they wanted Thomas to get further away from his apartment. The officers knew there were lookouts in the vicinity of Thomas's apartment and they did not want them to see the officers pull Thomas over.

Thomas did not stop immediately. He turned right from Poplar onto North Pauline Street, then made another right onto Collins Chapel Circle and stopped in the middle of the intersection of Collins Chapel Circle and Nabors Way. Sgt. Nemec testified that it took Thomas forty-five seconds from the time the police initiated the stop to pull over. After Thomas arrived at a stop, Detective Dobbins pulled up on Thomas's passenger side while Sgt. Nemec stopped on Thomas's driver side. (Ex. 3.)

Sgt. Nemec testified that Thomas's front windows were down, but that as he was approaching the driver's side of Thomas's car, Thomas raised the front windows leaving approximately 1.5 inch open space. The back windows were completely raised. As

he approached, Sgt. Nemec observed Thomas put something into his mouth. When Sgt. Nemec reached the driver's side of Thomas's car, Thomas started yelling and loudly asked him why he was being pulled over. Sgt. Nemec asked Thomas for his driver's license and registration. Thomas did not immediately comply and he kept arguing with Sgt. Nemec. Sgt. Nemec testified that while arguing Thomas reached to the right side of the car two or three times. Sgt. Nemec could not tell what Thomas was doing with his hands, whether Thomas was reaching to the right side of his body or whether he was reaching for the car console. At this point, Sgt. Nemec asked Thomas to put the car in park and turn off ignition. Sgt. Nemec testified that he made this request because he was concerned for the officers' safety: Sgt. Nemec could not see what Thomas was reaching with his hands, Thomas was being argumentative and failed to comply with Sgt. Nemec's commands, and Sgt. Nemec saw Thomas put something in his mouth. Sgt. Nemec was also concerned that Thomas would flee the scene because, as Sgt. Nemec testified, most people do not leave the car in gear during a traffic stop.

Thomas did not comply with Sgt. Nemec's directive to put the car in park and turn off ignition, he continued being argumentative, and asked for a lieutenant to make the scene. Eventually, Thomas handed Sgt. Nemec his license and registration but again refused to put the car in park and turn

it off.  At this point, Sgt. Nemec saw Detective Dobbins reach through the passenger window, unlock the door, and get into the vehicle.  Sgt. Nemec testified that the car took off and started zigzagging while going down Nabors Way.  Shortly after, Thomas jumped out of the moving car and took off running southbound toward Collins Chapel Circle.  As he was running through a front yard, Sgt. Nemec observed Thomas take a black object out of his waistband pocket and throw it on the ground.  Sgt. Nemec retrieved the object, a black pistol, at 937 Collins Chapel.

Detective Dobbins, the government's third witness, has worked as a police officer for the MPD for ten years, and, on September 10, 2014, was working for MPD's Organized Crime Unit. Detective Dobbins's account of what happened during Thomas's traffic stop was consistent with Sgt. Nemec's testimony.  In the morning of September 10, 2014, Detective Dobbins was stationed westbound on Court Avenue in an unmarked vehicle wearing plain clothes.  Detective Dobbins testified that he had clear view of the driveway and observed Thomas as he pulled out of the driveway.  (Ex. 5.)  Detective Dobbins was aware of Thomas's appearance and his vehicle because he participated in the background investigation that led to the search warrant for Thomas's residence.  According to Detective Dobbins, the driver's window of Thomas's car was lowered to halfway between Thomas's shoulder and elbow.  Thomas leaned forward to check

traffic before turning on Court Avenue, and Detective Dobbins observed that Thomas was not wearing a seatbelt. Detective Dobbins also testified that the window tint was darker than the state legal limit, which he believed to be 35%.

Once Thomas turned on Court Avenue, Detective Dobbins began following Thomas. Thomas turned north on Claybrook Street and then stopped at a stop sign on Claybrook Street and Poplar Avenue. At this intersection, Detective Dobbins was directly behind Thomas while Sgt. Nemec was a few cars behind. Detective Dobbins testified that he observed Thomas lean forward to check traffic and then make a left on Poplar Avenue. At this point, Detective Dobbins observed for a second time that Thomas was not wearing his seatbelt. Detective Dobbins initiated a traffic stop on Poplar Avenue, east of North Pauline Street, by turning his blue lights and sirens on. Detective Dobbins testified that the reason for stopping Thomas was for a seatbelt violation and a window tint violation.

Detective Dobbins also testified that Thomas did not stop immediately but took approximately forty-five seconds to pull over. Thomas turned right from Poplar into North Pauline Street, made another right onto Collins Chapel Circle, and stopped in the middle of the intersection of Collins Chapel Circle and Nabors Way. After Thomas arrived at a stop, Detective Dobbins pulled up on Thomas's passenger side while

Sgt. Nemec stopped on Thomas's driver side. (Ex. 3.) Detective Dobbins testified that at that point both officers were wearing vests marked MPD and badges identifying them as MPD officers.

Detective Dobbins testified that as he approached Thomas's passenger side, Thomas raised the passenger window leaving only two inches of space. As the officers were approaching Thomas's vehicle, Sgt. Nemec communicated verbally to Detective Dobbins that Thomas put something in his mouth. Detective Dobbins asked Thomas what he put in his mouth but Thomas denied putting anything in his mouth. Detective Dobbins testified that he also heard Thomas's car doors locking.

According to Detective Dobbins, Sgt. Nemec made several requests to Thomas to produce his driver's license and registration but Thomas repeatedly refused to comply and asked to speak to a lieutenant. Detective Dobbins also observed Thomas reach for something multiple times but could not see what Thomas was attempting "to hide, conceal or retrieve." (Tr. 79, ECF No. 44.) Detective Dobbins testified that Thomas refused to obey Sgt. Nemec's several commands to put the car in park and shut the vehicle off. At this point, Detective Dobbins reached inside the front passenger window, unlocked the door, entered the vehicle, and turned the ignition switch off. Thomas restarted the vehicle and accelerated driving west on Nabors Way. A struggle followed between Thomas and Detective Dobbins

for control of the switch while the car zig-zagged down Nabors Way. After several seconds of fighting for control of the vehicle, Thomas jumped out of the moving car and began running south towards the houses on Collins Chapel Circle. (Ex. 4.) Detective Dobbins jumped into the driver's seat, took control of the moving vehicle, put it in park, and ran after Thomas on foot. (Ex. 7.) Detective Dobbins testified that he did not initially see where Thomas ran but that neighbors pointed him towards Thomas's direction. He then saw Thomas in the back yard of some houses and gave Thomas commands to stop running which he ignored.

When questioned why he found it necessary to enter the car, Detective Dobbins stated that he unlocked and entered Thomas's car because he was concerned with officer safety. Detective Dobbins perceived that the threat level was rising because it took Thomas forty-five seconds to pull over; Thomas raised the windows, locked the car doors, and put something in his mouth as the officers were approaching; the officers observed movement inside the car and were not sure what Thomas was attempting to reach; and Thomas refused to comply with Sgt. Nemec's commands.

## II. PROPOSED CONCLUSIONS OF LAW

In the instant motion to suppress, Thomas challenges the validity of his traffic stop. (Def.'s Mot. to Suppress 4-5, ECF No. 27.) Thomas further argues that even if the traffic stop

was legitimate, the length of his detention exceeded the initial purpose of the stop. (*Id.* at 5.) In response, the government submits that the police officers had both reasonable suspicion *and* probable cause to conduct a traffic stop and that the officers' conduct during the traffic stop was reasonable. (Gov't's Resp. 3-6, ECF No. 31.) In its supplemental brief, the government argues that even if the initial traffic stop was illegal, Thomas's actions in fleeing the police and driving recklessly constitute new, distinct crimes, which, pursuant to *United States v. Castillo*, 238 F.3d 424 (6th Cir. 2000), rendered the subsequent recovery of the firearm admissible.

A.   The Credibility of the Witnesses

The court is given wide latitude in making its credibility determinations. *United States v. Haynes,* 301 F.3d 669, 679 (6th Cir. 2002)(citing *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 573-75 (1098)). "In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic." *United States v. Caldwell*, No. 1:13-CR-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015). The court finds the witnesses in this case credible. Specifically, Sgt. Nemec and Detective Dobbins testified consistently with one another. They provided virtually identical accounts of what happened on September 10, 2014. Further, Thomas did not call

any witnesses, and, therefore, Sgt. Nemec's and Detective Dobbins's testimonies are not contradicted.

B. <u>Validity of the Traffic Stop of Thomas's Vehicle</u>

A traffic stop is a "seizure" subject to the reasonableness requirement of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *United States v. Guajardo*, 388 F. App'x 483, 487 (6th Cir. 2010)("The Fourth Amendment's prohibition against unreasonable searches and seizures by the government 'extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest.'" (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002))). In the Sixth Circuit, the applicable standard to justify a police officer's stop of a vehicle based on a traffic violation depends on whether the violation is an ongoing or completed offense. *See United States v. Simpson*, 520 F.3d 531, 540-41 (6th Cir. 2008). The Sixth Circuit held in *Simpson* that based on its prior decision in *United States v. Freeman*, 209 F.3d 464 (6th Cir. 2000), officers must have probable cause to initiate a traffic stop for a completed misdemeanor, such as veering into an emergency lane, but only reasonable suspicion for a traffic stop for an ongoing misdemeanor, such as driving on a suspended license. *Id.* at 541; *see also United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007).

The permissibility of a traffic stop does not depend on the actual motivations of the individual officers involved. *Whren*, 517 U.S. at 813; *United States v. Hughes*, 606 F.3d 311, 315-16 (6th Cir. 2010); *United States v. Burton*, 682 F.3d 514, 516 (6th Cir. 2012). Thus, if at the time of the stop, the officer had a reasonable suspicion that the target was violating a traffic law or ordinance, "then it simply does not matter whether [the officer] intended to stop [the defendant] on the basis of that traffic violation" or instead intended to stop the defendant because he suspected criminal activity was afoot. *Hughes*, 606 F.3d at 316. The Sixth Circuit explains:

> [I]n order for traffic stop to be permissible under the Fourth Amendment, a police officer must know or reasonably believe that the driver of the car is doing something that represents a violation of law. This is not to say that officers must be able to, at the time of a stop, cite chapter and verse - or title and section - of a particular statute or municipal code in order to render the stop permissible.

*Id.*

Here, Thomas's offenses of not wearing a seatbelt and violating window tint law were ongoing, thus, subject to the reasonable suspicion standard. Having found the officers' testimonies reliable, the court finds that there was reasonable suspicion for initiating the traffic stop.[3] At the suppression hearing, both officers testified that they stopped Thomas

---

[3]The court also finds that probable cause existed to stop Thomas's vehicle.

because they believed that two independent traffic offenses had occurred. First, Detective Dobbins testified that he observed that Thomas was not wearing a seatbelt on two occasions. Under Tennessee law, all persons operating and riding in a motor vehicle must wear a seatbelt while the vehicle is in forward motion. Tenn. Code Ann. § 55-9-603(a)(1). Detective Dobbins's testimony that Thomas was not wearing a seatbelt is further corroborated by Thomas's own admission during a phone call he made from West Tennessee Detention Facility that he was not wearing a seatbelt. (Ex. 1.)

Second, both officers testified that based on their experience they believed that Thomas's window tint resulted in visible light transmittance of less than 35%, which constitutes a violation of state law. *See* Tenn. Code Ann. § 55-9-107(a)(1)(A)(making it illegal for anyone to operate a motor vehicle with window tint that results in visible light transmittance of less than 35%). By contrast, the Memphis City ordinance regarding window tinting in effect at the time of Thomas's traffic stop made it illegal for any person to operate a vehicle with a window tint that reduces the light transmittance in both front windows below 18%. (Ex. 2.) After observing Sgt. Nemec testify, the court believes that Sgt. Nemec was not aware that any distinctions existed between the Tennessee statute and the Memphis ordinance applicable at the

time of Thomas's arrest.  Sgt. Nemec was not aware of the light transmittance standard required by the City of Memphis ordinance and he was relying on the Tennessee state statute as a basis for the stop.  Detective Dobbins also testified that he was relying on state law as a basis for the traffic stop.  The officers therefore had reasonable suspicion to believe that Thomas's vehicle was being operated in violation of state law.  *See United States v. Moreno*, 43 F. App'x 760, 766 (6th Cir. 2002)(holding that police had reasonable suspicion that the defendant's windows violated the law even though the officer was confused "about the origin of the law which he was enforcing — that is, whether it was a state statute or a municipal ordinance"); *United States v. Ramirez*, 115 F. Supp. 2d 918, 922-23 (W.D. Tenn. 2000)(stating that the officer's "befuddlement as to whether the Memphis ordinance was identical to the state statute does not deprive the stop of probable cause"); *see also Hughes*, 606 F.3d at 316 (stating that a police officer must reasonably believe that the driver of the car is violating the law but need not be able to cite the particular statute or municipal code in order for the stop to be permissible).

For the foregoing reasons, the officers had developed a reasonable articulable suspicion to stop Thomas for committing two distinct traffic law violations.

C.    The Scope of Thomas's Traffic Stop

Thomas argues that the scope of the traffic stop exceeded the original purpose for which the officers made the stop. Thomas maintains that once Thomas provided his driver's license and registration to the officers, it was not reasonable for the officers to either request that Thomas turn off his engine nor invade Thomas's vehicle. "An ordinary traffic stop [] is more akin to an investigative detention rather than a custodial arrest, and the principles announced in *Terry v. Ohio*, 392 U.S. 1 (1968), apply to define the scope of reasonable police conduct." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999)(citing *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996)). "[A]ny subsequent detention after the initial traffic stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to the circumstances justifying the initial interference." *Id.* (citing *Terry*, 392 U.S. at 20); *see also United States v. Bonilla*, 357 F. App'x 693, 696 (6th Cir. 2009)("In order to remain within the scope of the initial traffic stop, the officer's actions must reasonably relate to the purpose of the original stop.").

The Sixth Circuit has held that an officer's request for a "driver's license, registration, rental papers, running a computer check thereon, and issuing a citation do not exceed the scope of a traffic stop" for a traffic violation. *Bonilla*, 357 F. App'x at 696; *see also Hill*, 195 F.3d at 269-70. Further,

"[o]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Bonilla*, 357 F. App'x at 696 (quoting *Pennsylvania v. Mimms*, 434 U.S. 107, 111 n.6 (1977)); *see also United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013)(quoting the same).

Once the purpose of the traffic stop has been fulfilled, "a police officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008)(citations and internal quotation marks omitted); *Hill*, 195 F.3d at 264 ("Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." (citations omitted)). "'Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop.'" *Bonilla*, 357 F. App'x at 698 (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001)).

During a traffic stop, officers may take any measures that
are "reasonably necessary to protect their personal safety and
to maintain the status quo during the course of the stop."
*United States v. Newell*, 596 F.3d 876, 879 (8th Cir.
2010)(quoting *United States v. Hensley*, 469 U.S. 221, 235
(1985)). The reasonableness of law enforcement's actions during
a traffic stop depends "on a balance between the public interest
and the individual's right to personal security free from
arbitrary interference by law officers." *Mimms*, 434 U.S. at
109. The concern for officer safety far outweighs *de minimis*
intrusions. *Id.*

In the instant case, Sgt. Nemec's instruction to put the
vehicle in park and turn off the engine did not constitute an
extension of the traffic stop. This request in itself does not
constitute a violation of the Fourth Amendment's proscription of
unreasonable seizure. Pursuant to *Mimms*, the police officers
may order the driver of the vehicle to get out of the vehicle
once it has been lawfully detained for a traffic violation.
*Mimms*, 434 U.S. 111. Asking the driver to place his vehicle in
park and shut off the engine, as was the case here, is an even
lesser intrusion upon an individual's Fourth Amendment rights.
Thus, such a request did not exceed the scope of the initial
traffic stop.

Thomas's behavior during the traffic stop generated the necessary reasonable suspicion to justify further detention of Thomas and the intrusion by Detective Dobbins. Both officers testified that their suspicions were aroused by a number of factors: First, Thomas did not immediately pull over after the officers initiated a traffic stop but continued to drive for forty-five seconds. Second, as the officers approached Thomas's car, Sgt. Nemec observed him put something in his mouth. Third, upon seeing the officers approach his vehicle, Thomas rolled up the windows and locked the vehicle doors. Fourth, Thomas did not comply with Sgt. Nemec's multiple requests to produce his driver's license and registration. Fifth, both officers witnessed Thomas reach to his right a few times but could not see what he was doing with his hands. Sixth, Thomas refused to comply with Sgt. Nemec's numerous requests to place his vehicle in park and shut off the engine. These events, along with the officers' prior investigation of Thomas for narcotics, provided the officers with a reasonable suspicion that criminal activity was afoot.

Furthermore, in light of Thomas's refusal to turn off his engine and already suspecting Thomas of criminal activity, Detective Dobbins's decision to enter Thomas's car and disable the engine was reasonable and necessary to reduce the risk of harm and prevent Thomas from fleeing. *See United States v.*

*Jackson*, 573 F. App'x 401, 405 (6th Cir. 2014)(holding that forcibly removing the defendant from his vehicle was reasonable, where officer stopped the defendant on the side of a highway at 2.00 a.m., suspected that the defendant was intoxicated, was unable to ascertain why the defendant was reaching into the center console, and the defendant refused to obey the officer's commands to exit the vehicle); *United States v. Herbin*, 343 F.3d 807, 810 (6th Cir. 2003)(holding that officers who performed a valid traffic stop on two vehicles and observed one driver exist the car as if to flee acted reasonably in drawing their weapons, seizing the occupants, and removing the key from the ignition); *Newell*, 595 F.3d at 879-80 (holding that the officers' actions of opening the car doors with tinted windows in order to see the defendant, ordering the defendant to place his hands on the steering wheel, grabbing the defendant's right arm and removing him from the vehicle after he refused to comply with the officers' instructions, were reasonable).

Thomas argues that *Herbin* is distinguishable because "[t]he agents [in *Herbin*] admitted that their primary mission was to pursue a drug-trafficking investigation, not to enforce the traffic laws," and, therefore, "[a] different standard applies to a *Terry* stop than to a stop such as the one involving [] Thomas." (Def.'s Reply 1, ECF No. 46.) Thomas's reading of *Herbin* is erroneous. A *Terry* stop is an investigatory stop

performed when the officer has a reasonable suspicion of criminal activity. *See Terry*, 392 U.S. at 20-21. Although the officers suspected that the defendant Herbin was involved in drug-trafficking activity, the officers stopped Herbin's vehicle after they observed traffic violations. *Herbin*, 343 F.3d at 808. The *Herbin* court stated that the officers' subjective intentions to investigate drug activity were irrelevant because the officers had probable cause to stop the defendant for traffic violations. *Herbin*, 343 F.3d at 809-10. Therefore, contrary to Thomas's contention, the stop in *Herbin* was not a *Terry* stop, but, as in the instant case, a stop properly based on the officers' observations of traffic violations. Accordingly, the officers' actions were reasonable under the circumstances and did not exceed the bounds of a *Terry* stop.

D. <u>Whether Thomas Committed a New, Distinct Crime that Rendered the Subsequent Recovery of the Firearm Admissible</u>

The government argues that even if the initial traffic stop was unconstitutional, Thomas committed a new, distinct crime when he struggled with the police officers, jumped from the moving vehicle, and fled from police. These actions, the government argues, dissipated any taint by the initial traffic stop and rendered evidence subsequently seized admissible. "It is widely recognized that '[i]f a suspect's response to an illegal stop is itself a new, distinct crime, then the police

constitutionally may arrest the [suspect] for that crime.'" *United States v. Castillo*, 238 F.3d 424, 2000 WL 1800481, at *5 (6th Cir. 2000)(quoting *United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997)). "This is true 'even if the new crime is in response to police misconduct and causally connected thereto.'" *Id.* (quoting *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982)). Any evidence obtained as a result of the new crime committed, is admissible at trial. *Id.* at *6.

The facts in this case are very similar to the facts in *United States v. Castillo*. In *Castillo*, officer Bales stopped a vehicle owned by defendant Castillo and driven by Vespie because he knew that Vespie did not have a valid driver's license. *Id.* at *1. Castillo was a passenger in the vehicle, and after the vehicle stopped, he exited the car and walked towards the driver's side. *Id.* Bales obtained Castillo's license and Castillo accompanied Bales to the patrol car, where Bales began conducting a driver's license and criminal background check on Castillo. *Id.* Bales sought permission to search the car, and, when Castillo refused to consent, Bales informed him that a canine unit would be called to sniff for drugs. *Id.* Shortly thereafter, Castillo jumped inside his car and fled at a high rate of speed. *Id.* After pursuing Castillo for several miles, Bales and other officers discovered his vehicle in a ditch and

discovered a blue bag containing cocaine in the woods near the vehicle. *Id.* at *2.

Castillo conceded that the officer had probable cause to stop Vespie for driving without a license, but maintained that his temporary detention was unconstitutional because Bales had no legitimate basis for continuing to detain him at the scene. *Id.* at *4. Castillo further argued that even assuming Bales lawfully detained him for the limited purpose of conducting a driver's license and criminal background check, Bales had completed the driver's license and background checks when Castillo fled the scene. *Id.* Thus, Castillo argued, because his continued detention violated the Fourth Amendment, the cocaine found in the bag near his abandoned vehicle should be suppressed as fruit of the poisonous tree. *Id.*

After two evidentiary hearings, the magistrate judge found that regardless of whether the defendant's detention was lawful, the subsequent search of his bag did not violate the Fourth Amendment because Castillo had abandoned the bag therefore surrounding his expectation of privacy in its contents. *Id.* at *3. The district court agreed and the Sixth Circuit affirmed. The Sixth Circuit stated:

> Even assuming, arguendo, that his detention violated the Fourth Amendment, the cocaine subsequently found near the abandoned Mercury is not subject to [suppression], as it is not a product of his detention. In determining whether evidence obtained

24

following an illegal seizure is subject to suppression, the "question in such a case is 'whether granting establishment of the primary illegality, the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

. . .

In the present case, we conclude that Castillo's high-speed flight from Bales and the other officers constituted an intervening act that purged the taint of his detention, assuming, arguendo, that his continued detention by Bales violated the Fourth Amendment. . . . When Castillo recklessly fled the scene, Bales and the other officers unquestionably had probable cause to pursue him for a new, independent crime. Thus, Castillo's high-speed flight dissipated any taint that might have resulted from his detention, thereby rendering admissible the cocaine found in the blue bag near the abandoned Mercury. In short, the cocaine was not obtained by exploitation of Bales' allegedly unlawful seizure of Castillo. Rather, the evidence was obtained "'by means sufficiently distinguishable to be purged of the primary taint.'" As a result, the district court properly overruled Castillo's pre-trial suppression motion.

*Id. a*t \*5-6 (6th Cir. 2000) (quoting *Wong Sun v. United States,* 371 U .S. 471, 488 (1963))

In the similar case of *United States v. Allen*, 619 F.3d 518 (6th Cir. 2010), the officer attempted to stop a car driven by Bush with defendant Allen as a passenger. *Id.* at 521. Bush initially stopped but then fled the scene leading the officers in a high-speed chase. *Id.* After Allen was detained, the officers found a bag containing cocaine and a handgun. *Id.* Allen maintained that the evidence seized should have been suppressed because the traffic stop was illegal. *Id.* at 526.

As in *Castillo*, the court held that "the act of fleeing from police officers constituted a new, distinct crime that rendered evidence subsequently seized admissible." *Id.*

Similarly, here, there was an initial attempt at a traffic stop which Thomas claims to have been illegal, followed by an attempt by Thomas to escape from the MPD officers while struggling with Officer Dobbins for control of his car. Thomas proceeded to drive recklessly in a residential area, jumped from a moving car, and continued running from the officers. Given Thomas's actions, the officers had probable cause to pursue him for a new, independent crime.[4]

Thomas seeks to distinguish *Allen* and *Castillo* asserting that in those cases the defendants decided on their own to flee the police without any prompting from law enforcement, whereas

---

[4]As in *Castillo*, Thomas's action might have violated several provisions of Tennessee law. *See Castillo*, 2000 WL 1800481, at *6 n.3. Tennessee Code Annotated § 55-10-205(a) prohibits driving "any vehicle in willful or wanton disregard for the safety of persons or property." In addition, Tennessee Code § 39-16-602(a) makes it unlawful for a person to "intentionally prevent or obstruct anyone known to the person to be a law enforcement officer . . . from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another." "[I]t is no defense to prosecution under this section that the stop, frisk, halt, arrest or search was unlawful." *Id.* § 39-16-602(b). Further, Tennessee Code Annotated § 39-16-603(b)(1) makes it "unlawful for any person, while operating a motor vehicle on any street, road, alley or highway . . . to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop."

here, law enforcement unexpectedly invaded the interior of Thomas's vehicle causing Thomas to drive off. (Def.'s Supplemental Brief 2, ECF No. 43.) Thomas's argument is not well-taken as it is specifically rejected by both *Castillo* and *Allen*. In *Castillo*, the court held that the police may arrest the suspect for a new distinct crime "even if the new crime is in response to police misconduct and causally connected thereto." *Castillo*, 2000 WL 1800481, at *5. Therefore, the officers could arrest Thomas for resisting arrest and recklessly endangering Officer Dobbins and the public even if Thomas's actions were in response to Officer Dobbin's unreasonable invasion. "[A] contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." *Castillo*, 2000 WL 1800481, at *5 (quotation omitted).

As in *Castillo*, the officers seized the firearm after Thomas abandoned it while fleeing from the officers. Thomas's reckless driving and his flight from the police dissipated any taint that might have resulted from an allegedly unreasonable detention, thereby rendering admissible the firearm abandoned by Thomas.

## III. RECOMMENDATION

For the reasons expressed above, it is recommended that Thomas's motion to suppress be denied.

Respectfully submitted this 12th day of May, 2016.


                    s/Diane K. Vescovo
                    DIANE K. VESCOVO
                    UNITED STATES MAGISTRATE JUDGE

NOTICE

Within fourteen (14) days after being served with a copy of this report and recommended disposition, a party may serve and file written objections to the proposed findings and recommendations. A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Failure to file objections within fourteen (14) days may constitute a waiver of objections, exceptions, and further appeal.